# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.

VERNON RANDEL, individually and on behalf of others similarly situated, and
CHERYL RANDEL, individually and on behalf of others similarly situated,

Plaintiffs,

v.

PARKLAND HOMEOWNERS ASSOCIATION, INC., a Colorado corporation,

Defendant.

---

## COMPLAINT FOR DECLARATORY RELIEF

---

COME NOW Plaintiffs Vernon Randel and Cheryl Randel (the "Randels"), by and through counsel, Treece Alfrey Musat P.C., and for this Complaint for Declaratory Relief state as follows:

## I.        Introduction

"Administrative law is not for sissies."  Antonin Scalia, *Judicial Deference to Administrative Interpretations of Law*, 1989 DUKE L.J. 511, 511.

This suit concerns the 40+ year history of the creation, operation, modification, and use of a private airpark located near Erie, Colorado.  Operations at the airpark fall within the jurisdiction of the Federal Aviation Administration ("FAA"), which requires among other things affirmative reporting of changes to the airpark which must be reviewed and acted upon by the FAA prior to implementation for, among other reasons, airway and ground safety.

Recent changes to the historical use of the airpark have caused significant disputes between the airpark's manager, a homeowner's association, and several of its members, including Plaintiffs.  The disputes led to land use litigation in state court, which is ongoing.  In the course of discovery and ongoing investigation, including Freedom of Information Act requests directed to the FAA, Plaintiffs and others discovered that the FAA's records concerning the airpark, dating back to its inception of creation and modification of its runways and taxiways, are missing required pre-creation and modification forms, and are missing records of FAA evaluations of the creation and changes to the airpark.

Recent use changes by some members of the HOA, including changing the character of a taxiway into an unrestricted runway without FAA approval, have led to disputes concerning operations safety, bodily and property harm to both pilots and persons on the ground attendant to runway operations, potential private property takings as a result of calling a taxiway a runway due to FAA regulations, and even criminal charges against one of the Plaintiffs due only to the disputed interpretation of FAA-allowed facility use.  As recently as September of 2017, the FAA local office with jurisdiction over safety requested members of the HOA direct it as airpark manager to file the required forms for unreported modifications so that the FAA may review current operations for airspace safety concerns, which have been significant enough as to prompt the local school district to re-route buses away from the airpark due to low flying aircraft.

Plaintiffs requested the HOA fulfill its regulatory obligations to report changes to the operation of the airpark to the FAA.  The HOA refused.  This suit follows.

## II.     Parties, Venue, and Jurisdiction

1.      Plaintiff Vernon Randel is a resident of the State of Colorado, with a local address of 4719 Beverly Lane, Erie, CO 80516, is a certificated pilot, and is a member of the Parkland Homeowners Association, Inc.

2.      Plaintiff Cheryl Randel is a resident of the State of Colorado with a local address of 4719 Beverly Lane, Erie, CO 80516, is a certificated student pilot, and is a member of the Parkland Homeowners Association, Inc.

3.      Defendant Parkland Homeowners Association, Inc., is a Colorado corporation in good standing with a street address of 1525 Rue De Trust, Erie, CO 80516 (the "HOA"). The HOA is responsible for the management and operation of common real property owned by the members of the HOA, including property designated for use as a private airfield known as "Parkland Airport."

4.      Both of the Randels are common real property owners with rights and interests in the property used for Parkland Airport.

5.      Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b) as the matters giving rise to the relief requested herein have occurred, and continue to occur, exclusively within the State of Colorado, and the Defendant is a corporate entity formed under the laws of the State of Colorado with its principal place of business within the state such that it is a resident of Colorado pursuant to 28 U.S.C. § 1391(c)(2).

6.      This Court has jurisdiction over this action under 28 U.S.C. § 1331 (federal question) and the Declaratory Judgment Act, 28 U.S.C. § 2201.

### III.   General Allegations

**A.  The Federal Regulatory Framework Governing Airspace and Private Airports**

7.      The Federal Aviation Administration is a subdivision of the Department of Transportation created by statute under 49 U.S.C. § 106.  Among other mandates, the Administrator of the FAA has sole authority to develop plans and policies for the use of navigable airspace within the United States.  49 U.S.C. § 40103(a)(1), (b)(1).

8.      The FAA is required by statute to prescribe regulations on the flight of aircraft for both in-air navigation, and to protect individuals and property on the ground.  49 U.S.C. § 40103(b)(2)(A)-(B).

9.      Under the rules promulgated by the FAA pursuant to its statutory authority, an "airport" is "an area of land or water that is used or intended to be used for the landing and takeoff of aircraft, and includes its buildings and facilities, if any."  14 CFR § 1.1.

10.     The FAA defines "person" as "an individual, firm, partnership, corporation, company, association, joint-stock association, or governmental entity.  It includes a trustee, receiver, assignee, or similar representative of any of them."  14 CFR § 1.1.

**B.  Part 157**

11.     Regulations promulgated by the FAA include mandatory reporting for the proposed construction, alteration, activation, and deactivation of airports as codified in 14 CFR § 157 ("Part 157").

12.     Part 157 "applies to persons proposing to construct, alter, activate, or deactivate a civil or joint-use (civil/military) airport or to alter the status or use of such an airport.

Requirements for persons to notify the Administrator concerning certain airport activities are prescribed in this part."  14 CFR § 157.1.

13.    The FAA also publishes Orders that specify procedures for use by all personnel in the joint administration of the FAA's airspace program.  These Orders include, for example, Order JO 7400.2L, which governs airport charting and publication of airport data.  FAA Order JO 7400.2L § 10-1-1 *et seq*., which supplement the requirements of Part 157.

14.    The guidelines, procedures, and standards contained in Joint Order 7400.2L "must be used in determining the effect construction, alteration, activation, or deactivation of an airport will have on the safe and efficient use of the navigable airspace by aircraft."  FAA Order JO 7400.2L § 10-1-1(b) (emphasis added).

15.    Part 157 requires that "[e]ach person who intends to do any of the following shall notify the Administrator in the manner prescribed in § 157.5: (a) Construct or otherwise establish a new airport or activate an airport. (b) Construct, realign, alter, or activate any runway or other aircraft landing or takeoff area of an airport."

16.    Part 157 mandates the submission of FAA Form 5010-3, the Airport Master Record ("AMR"), to the FAA so that the agency is made aware of necessary descriptions of the physical and operational characteristics of a proposed airport, and provide critical aviation safety information for publication in charts and handbooks.  The AMR is the FAA's source for the information used in aeronautical charts and flight information publications.

17.    Part 157 mandates FAA Form 7480-1 to be submitted to the FAA at least 90 days before construction, alteration, activation, deactivation, or change to the status or use of a civil or joint-use (civil/military) airport.  14 CFR § 157.5(a)(1).

18.     The intent of the notice is to allow the FAA sufficient time to study the effects of the proposed construction, alteration, activation, and the like to make one of three determinations: no objection; conditional; and objectionable.  14 CFR § 157.7.  These determinations affect use, operations, and regulatory enforcement of the subject airports, can require remedial attention to cure, and can provide the basis for enforcement actions initiated by the FAA.

19.     In making its determination the FAA's aeronautical study considers "matters such as the effects the proposed action would have on existing or contemplated traffic patterns of neighboring airports; the effects the proposed action would have on the existing airspace structure and projected programs of the FAA; and the effects that existing or proposed manmade objects (on file with the FAA) and natural objects within the affected area would have on the airport proposal" and "the effects of the proposed action on the safe and efficient use of airspace by aircraft and the safety of persons and property on the ground[.]"  14 CFR § 157.7(a).

20.     The FAA, in addition to these mandates, publishes Advisory Circulars ("AC") which are intended to assist regulated persons and entities with methods for complying with FAA regulations, standardize the implementation of FAA regulations, and act as adjunct information to the general public concerning matters regulated by the FAA.

21.     ACs are not, unless specified therein, mandatory, but are considered in advisory matters the agency's statement of position regarding the subject matter addressed by the AC.

### C. FAA Rules, Oversight, and Enforcement of Reporting Obligations

###    i.    Airport Design and Alteration Rules and Regulations

22.    Airport design standards published by the FAA are mandated in certain circumstances, and strongly encouraged for compliance in non-mandatory circumstances. FAA Order JO 7400.2L § 10-3-1(b).

23.    Even when not mandatory for the airport proponent/sponsor/planner, the FAA is still required to evaluate all proposals through their published criteria to issue determinations. FAA Order JO 7400.2L § 10-3-2(a).

24.    The only way the FAA is made aware of the information necessary to perform its required evaluation is through the mandatory submission of the required forms by the airport proponent/sponsor/planner. This is why FAA Form 7480-1 is required to be submitted in all circumstances of creation, alteration, and activation of an airport, whether or not the airport is federally obligated—that is, publicly owned and/or funded airports.

25.    Under these authorities, it is the airport proponent/sponsor/planner's sole and non-delegable duty to comply with these statutes, rules, and regulations in making all such reports prior to any creation, alteration, and activation of all or any part of an airport.

26.    Even if the required forms are timely submitted, and even if the FAA determines that the proposals are approved, FAA Form 7480-1 approvals become invalid after the date indicated in the final FAA report if the airport's proponent/sponsor/planner fails to implement the proposed changes by that date. In such a case, the process must begin anew with form submission.

27.     Matters considered by the FAA when evaluating forms and making determinations concerning airport alterations include, but are not limited to:

      a.   Runway length and width;

      b.   Runway surfaces and modifications thereto;

      c.   Line of sight minimums where two runways intersect;

      d.   Existence or addition of landing aids;

      e.   Proximity to public access roads;

      f.   Runway and taxiway lighting;

      g.   Adjacent structures, including landscaping, to runways which are or can be obstacles to air navigation;

      h.   Passive traffic control signage for runways and taxiways;

      i.   Runway threshold displacements; and

      j.   Air traffic safety minimums based on runway configurations and obstacles.

28.     Alterations affecting any of these criteria are sufficient to trigger the mandatory pre-construction reporting requirements of Part 157.

**ii.     Reported Information Jurisdiction**

29.     By Order, the FAA established the Office of Airport Safety and Standards ("AAS-1"), which is the intended recipient and custodian of information reported to the FAA via the above discussed forms.  AAS-1 is accountable for the proper handling of the resource they receive upholding any policies or regulations governing its use.  *See* FAA Order 5010.4A.  This includes the responsibility to conduct required aeronautical studies and issue determinations to airport proponents/sponsors/planners.

30.     By Order, the FAA also established the Airport Data and Information Management Program, which defines the roles and responsibilities of FAA personnel in the collection, management, processing, and handling of data describing the physical infrastructure, characteristics, services, and operational environment of airports.  *See* FAA Order 5010.4A. This includes direct oversight of the information required to be submitted by the airport proponent/sponsor/planner in the forms described above.

31.     By Order, the FAA Regional and District Airport Offices are responsible for advising individual airports about their role in the collection and management of airport data, including the importance of keeping their airport data current within the appropriate FAA authoritative source.  FAA Order 5010.4A 3-1(d)(1).

32.     The Regional Offices are likewise responsible for the coordination of airspace studies of airport proposals reported with these forms, conducting the necessary circularization, consolidating and resolving comments, and developing and forwarding the FAA determination to the airport sponsor/proponent.  FAA Order 5010.4A 3-1(d)(14).

### iii.    Related Jurisdiction Concerning Safety

33.     The FAA also established by Order and Regulation Flight Standards District Offices ("FSDO"), which are empowered to enforce regulations concerning airmen and aircraft.

34.     FSDO enforcement includes, but is not limited to, investigations into violations of the rules and regulations over aircraft operation into and out of airports, violations of airspace controls and limitations, and safety violations related to aircraft operation.

**D. FAA Compliance and Enforcement**

35.     FAA Order 2150.3B (the "Enforcement Order") is the staff manual publication which guides FAA offices, including the national network of FSDOs, and it exercise its discretion in carrying out statutory and regulatory enforcement responsibilities.  FAA Order 2150.3B 1-1, 1-2(a).

36.     The Enforcement Order gives FAA staff discretion and judgment authority in initiating and executing their investigation into, and regulatory and statutory enforcement of, the above cited authority.  FAA Order 2150.3B 1-2(b), 2-2(a).

37.     The Enforcement Order gives the FAA plenary authority to, among other things, levy fines, rescind licenses and certificates, impose injunctions, and create alternative means of ensuring pilots and entities within its jurisdiction comply with the law and to correct ongoing noncompliance.  FAA Order 2150.3B 2-2(b).

38.     The Enforcement Order recognizes that the rules and regulations covering civil aviation turn on voluntary compliance, and enforcement officials are within their discretion to determine means and methods to prompt voluntary compliance so that the agency may perform its supervisory role.  FAA Order 2150.3B 2.3(a), (d), (f)(1).

39.     "FAA investigative personnel recommend initially the appropriate type of response to address an apparent violation.  Often, they are in the best position to evaluate various subjective considerations, such as the apparent violator's compliance attitude and whether an alternative to legal enforcement action may be sufficient to achieve compliance."  FAA Order 2150.3B 2-3(i).

40.    "The voluntary disclosure reporting program is intended to improve safety compliance by forgoing a civil penalty when a regulated entity has promptly disclosed to the FAA an apparent violation and has taken prompt action satisfactory to the FAA to correct the violation and preclude its recurrence."  FAA Order 2150.3B 2-5(b).

**E.  The Establishment Of, And Changes To, Parkland Airport**

41.    On March 9, 1972, a developer entity known as Park Land Associates, whose address was 11145 Cherokee, Northglenn, Colorado 80234, executed an FAA Form 7480-1 for the establishment of a sport airpark near the Town of Erie, Colorado (the "1972 Form").

42.    The sport airpark was intended as a private airfield to serve residents of that development, and the 1972 Form gave notice to the FAA of an anticipated single runway facility intended only for visual flight rules ("VFR").

43.    The anticipated single runway would have an east/west orientation with a heading designation of 09/27, with a length of 3,300 feet and a width of 150 feet and a turf aggregate surface.

44.    On May 24, 1972, the FAA issued its determination of the aeronautical study based on the 1972 Form determining that the proposed facility would have no adverse impact on the safe and efficient use of airspace by aircraft.  Along with the determination, the FAA provided the record and documentation of its aeronautical study, which was limited to the proposed Runway 09/27.

45.    The FAA's determination expired on June 30, 1973.  No construction occurred prior to that expiration date.

46.    On November 19, 1976, Park Land Associates executed another FAA Form 7480-1 for the establishment of a sport airpark near the Town of Erie, Colorado (the "1976 Form").

47.    The 1976 Form proposed a similar private airpark for VFR-only operations, though this time proposed a single runway with the same east/west orientation but with a heading designation of 08/26, with a length of 3,300 feet and a width of now-50 feet and a turf aggregate surface.

48.    On November 29 of that year the FAA issued a notice to Park Land Associates that the prior 1972 Form, though approved, resulted in significant negative responses from the community around Parkland.

49.    According to its obligation, though, the FAA conducted a second aeronautical study on the 1976 Form and, on January 17, 1977, the FAA issued its determination of the aeronautical study based on the 1976 Form determining that the proposed facility would have no adverse impact on the safe and efficient use of airspace by aircraft.  Along with the determination, the FAA provided the record and documentation of its aeronautical study, which was limited to the proposed Runway 08/26.

50.    The FAA's determination expired on June 30, 1978.

51.    By January of 1978, efforts to obtain platting approval of the Parkland Airport were underway.

52.    Also in January of 1978, landowners of both separate lots held in fee simple and joint ownership interests in the land to be used for Parkland Airport executed a document called Restrictive Covenants for Parkland Estates of Weld County (the "Easements"), establishing by

and among themselves the joint responsibility to develop, maintain, and manage Parkland Airport.

53.    The Easements indicated the airpark had a single runway, and that the homeowners had sole ownership in property over which they would grant taxiway easements to the other landowners.

54.    The Easements did not grant authority for any member to convert, willingly or not, any other resident's taxiway easement into any other form of limited use right, including but not limited to using the taxiway easement for landing rights.

55.    The reasonable expectation of property owners concerning the scope of taxiway easements can and does differ significantly from that of granting an easement for use of property as a runway, as the FAA rules and regulations governing runways and taxiways differ significantly in terms of rights and obligations of entry on one or the other.

56.    On March 22, 1978, persons including Donald A. Mobley, as Manager of Defendant, executed the Articles of Incorporation for Defendant, which were filed with the Colorado Secretary of State on May 10, 1978.

57.    On March 31, 1978, the same incorporators adopted the By-Laws of Parkland Homeowners Association, Inc.

58.    According to the Articles of Incorporation and the By-Laws, Defendant is authorized to collect form HOA members fees, and from those fees manage and maintain the Parkland Airport, including but not limited to commonly-owned property.

59.    The HOA assumed then and still has, by these covenants, the obligation to make all required reports to the FAA concerning construction, alteration, activation, and any other modifications to Parkland Airport.

60.    The HOA also controls an architectural committee that limits size and location of structures built on member property, and has final authority for approval of all structures built by members on property in and around the Parkland Airport, to and including residences, outbuildings, and the like.

61.    In June of 1978, Mr. Mobley, as Manager of Defendant, caused to be filed with the FAA a Form 5010-5 (the "1978 AMR") that included the Runway 08/26 from the 1976 Form, but now indicated that runway would be 4,000 feet long by 150 feet wide and with a dirt surface, contrary to the prior submission.

62.    In addition, the 1978 AMR for the first time indicated a runway with a south/north heading indicated as 17/35 that would be 2,000 feet long, 100 feet wide, and have a dirt surface.

63.    The 1978 AMR indicated no taxiway lights, no segmented circle (a visual indicator system for landing patterns), and no runway lights.

64.    The FAA promptly caught Defendant's error and issued a letter notice to Mr. Mobley on or about August 16, 1978, advising Defendant of the myriad conflicts between the approved 1976 Form on which the aeronautical study was premised, and the 1978 AMR.

65.    In a letter issued to Mr. Mobley in August of 1978, the FAA identified all alterations in the 1978 AMR that deviated from the prior approval, and requested Defendant's

agent submit to the FAA the proposed subdivision plans that incorporated the changed conditions identified in the 1978 AMR.

66. In the same letter the FAA also directed Defendant to submit a new Form 7480-1 with all proposed alterations to the Parkland Airport that differed from the 1976 Form.

67. Neither the FAA nor Plaintiff have any record of a new Form 7480-1 submitted per that direction.

68. On December 5, 1978, the FAA issued a determination to Defendant indicating that it had performed a new aeronautical study for the new proposed features of Parkland Airport with no objection, along with a recommendation for mitigating existing obstacles and approach vectors.

69. The airpark's design called for one main runway, with houses situated in the development in a manner which allows each homeowner to have on their property hangars(s) in which to store aircraft. Access from individually-owned hangars to the runway is accomplished via a taxiway system.

70. The taxiway system is a series of easements along certain edges of residential property on which taxiways were constructed, such that homeowners can taxi airplanes out of their hangars and onto a taxiway which services a runway.

71. There is no record of additional Form 7480-1s having ever been submitted by Defendant to the FAA since the December 5, 1978, determination.

72. Parkland Airport is an airport within the definitions contained in Part 157, and is subject to the rules and regulations promulgated thereunder by the FAA.

73.     Due to the lack of mandatory reporting under Part 157, Parkland Airport also falls under the definition of "planned or proposed airport" for which no prior notice of constriction or alteration was provided to the FAA under Part 157.

74.     Since 1978, the HOA has caused and/or permitted the following construction, alterations, and modifications to the Parkland Airport:

   a.   Changes to runway length and width for both Runway 08/26 and Taxiway E/Emergency Landing Strip 17/35;

   b.   Changes to runway surface types;

   c.   Allowed building construction which restricts line of sight minimums where Runway 08/26 and Taxiway E/Emergency Landing Strip 17/35 intersect;

   d.   Modified and added landing aids;

   e.   Changed the proximity of runway and taxiway surfaces to public access roads;

   f.   Added and modified runway and taxiway lighting;

   g.   Allowed the construction, placement, and/or growth of adjacent structures, including landscaping, to runways which fall within the definition of obstacles to air navigation;

   h.   Added passive traffic control signage for runways and taxiways; and

   i.   Changed runway threshold displacements.

75.     None of these were accomplished with the prior required notice to the FAA, and none of these modifications have had the required aeronautical studies performed to determine the existence of objectional safety issues concerning airport operations and air navigation.

**F. Direct Harm to Plaintiffs**

76.     Between construction of the Parkland Airport in the late 1970s and 2017, the portion of land indicated on the 1978 AMR as Runway 17/35 was designated Taxiway E/Emergency Landing Strip.

77.     Plaintiffs own residential property along Taxiway E, and as part of the Covenants granted to the HOA a restricted easement on a portion of their property to the HOA to utilize that portion of their property for taxiing operations.

78.     Taxiway E is described on the Weld County approved plat for the development as a taxiway and emergency landing strip easement.

79.     Beginning in 2010, members of the HOA lodged complaints to Defendant that other members were using Taxiway E as an unrestricted runway, either without pretense or under the guise of proficiency training in case of an actual emergency.

80.     By December of 2010, the HOA published notification to all members that Taxiway E was an easement across private property and not commonly owned property such as that under Runway 08/26.

81.     The HOA directed all members that routine or daily takeoff and landing procedures on Taxiway E were prohibited.

82.     This confirmed that the portion of Plaintiffs' property on which Taxiway E runs and on which Plaintiffs granted a restricted easement to Defendant was, in fact, Plaintiffs' property and not Defendants for unrestricted use.

83.     Weld County confirmed as recently as 2014 that the use of the restricted easements for Taxiway E, including the portion of property owned by Plaintiffs, is for taxiing operations and emergency landings only.

84.     No plat amendments have been made and approved by Weld County affecting the limitations of these restricted easements.

85.     Taxiway E does not conform to the specifications of the proposed Runway 17/35 in the 1978 AMR.  In fact, it is only 30 feet wide, less than half the width contemplated by the FAA per the 1978 AMR.

86.     Taxiway E, when used as a runway, intersects Runway 08/26 for which minimum design standards for line of sight are not met per FAA guidelines.

87.     Taxiway E, when used as a runway, applies different FAA regulatory and rule standards on the paved surface, including legal limitations and consequences for incursion onto the runway surface by ground-based vehicles.

88.     Use of Taxiway E as an unrestricted runway creates significant safety issues to Plaintiffs, including but not limited to:

a.   Aircraft performing regular and routine takeoff and landing procedures to be operated within dangerous proximity of residences, structures, and obstacles, including Plaintiffs' home, placing them in a constant state of physical harm;

b.   Making inherently dangerous their use of their right to access Runway 08/26 by way of Taxiway E due to the constant likelihood of approaching and departing aircraft traffic on Taxiway E which is not easily visible due to obstructions and line of sight;

89.     In addition, the use of Taxiway E as an unrestricted runway causes the following direct harm to Plaintiffs:

      a.  An effective taking of the portion of their property on which the easement exists on which they are precluded from accessing Taxiway E while it is in use as a runway by FAA rules and regulations;

      b.  Caused a criminal citation to be issued to Plaintiff Vernon Randel for operation of a lawn mowing apparatus within the easement under the premise that Taxiway E is an unrestricted runway and that FAA rules and regulations concerning runways—as opposed to taxiways—govern Plaintiff Vernon Randel's rights to access and use his own property;

      c.  Disrupted their right to quiet enjoyment of their residential property;

      d.  Effectively restricted their right to access Runway 08/26 by way of Taxiway E due to the constant likelihood of approaching and departing aircraft traffic on Taxiway E;

90.     Between Defendant's affirmation of the restricted-use status of Taxiway E as an emergency landing strip only in 2010 and 2017, the leadership composition of Defendant changed.

91.     In 2017 the HOA caused signage indicating Taxiway E to be removed, and re-branded Taxiway E as Runway 17/35 by both signage and painted indicators on the paved surface of Taxiway E.  The HOA authorized this change and activation of a runway—for which no aeronautical study has been performed—without submitting a Form 7480-1 to the FAA.

92.     At the point where Taxiway E and Runway 08/26 intersect, the northern extension of what would be a continuation of Taxiway E runs onto unpaved native soil. The HOA authorized that portion of what they now call Runway 17/35 to be rototilled in 2017, altering the surface without submitting a Form 7480-1 to the FAA.

93.     By September of 2017 and as a result of continued and unevaluated use of Taxiway E as a runway, Plaintiffs contacted the Denver FSDO directly to voice their concerns about the safety of changed airport operations concerning Taxiway E. FAA representatives from the Denver FSDO advised Plaintiffs that the FAA's enforcement arm was concerned about the likelihood of airspace safety issues caused by the unapproved change in use of Taxiway E.

94.     On September 14, 2017, the FAA Safety Team Program Manager and the FAA Airports District Office Manager advised Plaintiffs to direct the HOA to file the required Form 7480-1 regarding the changed use of Taxiway E, and directed Plaintiffs to Part 157 (and Part 77).

95.     This direction constituted a determination by the FAA that an aeronautical study of Parkland Airport based on current operations is necessary. This compels Defendant to act accordingly in submitting the required Form 7480-1.

96.     This direction constituted FAA discretionary enforcement of voluntary compliance as contemplated by the Enforcement Order.

97.     This direction constituted an attempt to avoid enforcement to include civil penalties by allowing a regulated entity the opportunity to correct an ongoing noncompliance issue as contemplated by the Enforcement Order.

98.     Plaintiffs provided written notice of these violations of FAA rules and regulations and demanded Defendant mitigate the violations by submitting the required Form 7480-1 to

account for all of these alterations and activations at Parkland Airport and initiate the required FAA evaluation of the same.

99.    As part of the demand, Plaintiffs prepared a proposed Form 7480-1 for the HOA to have executed by an authorized representative.

100.    Defendant, by email from the HOA's own counsel, denied that request.

101.    Defendant has refused, and continues to refuse, to comply with the rules, regulations, and directives of the FAA concerning airport operations at Parkland Airport.

102.    Such refusal is in contravention to federal law.

103.    Such refusal is in contravention to the enforcement authority's proposal to voluntarily correct noncompliance to avoid civil enforcement and civil penalties as contemplated by the Enforcement Order.

104.    Such refusal has, and continues, to cause direct and actual harm to Plaintiffs and persons similarly situated, including physical and property endangerment, and regulatory enforcement issues affecting the HOA and Plaintiffs' use of their owned and shared property and use of the airport.

105.    Defendant's refusal to comply with federal law has and will continue to cause injury to property, and likely serious bodily injury or death, if Defendant is not compelled to act according to federal law and agency directive.

106.    Defendant's refusal to comply with federal law and enforcement directive has and will continue to expose Plaintiffs and other members of the HOA to civil enforcement action, to and including monetary penalties and restrictions on use of their property and community property for its intended purpose as an airport.

## IV.    CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Declaratory Judgment Pursuant To 28 U.S.C. § 2201(a)**

107.    Plaintiffs incorporate the above as if fully set forth herein.

108.    An actual, present, and justiciable controversy exists between Plaintiffs and Defendant whereby leadership of Defendant refuses to act in conformity with federal law, direct federal enforcement instruction, and in the best interests of Plaintiffs and others similarly situated.

109.    Defendant's refusal to comply with federal law has and will continue to cause injury to property, and likely serious bodily injury or death, if Defendant is not compelled to act according to federal law and agency directive.

110.    There is no other adequate remedy at law.

111.    Plaintiffs seek declaratory judgment that Defendant is obligated to comply with federal law and enforcement directives in submitting a Form 7480-1 for all construction, alterations, and modifications to the Parkland Airport which have occurred since 1978, including specific disclosure of all details concerning all of the following items which deviate from the approved form of Parkland Airport as described in the 1978 AMR:

    a.    Changes to runway length and width for both Runway 08/26 and Taxiway E/Emergency Landing Strip 17/35;

    b.    Changes to runway surface types;

    c.    Building construction which restricts line of sight minimums where Runway 08/26 and Taxiway E/Emergency Landing Strip 17/35 intersect;

    d.    Modified and added landing aids;

e.  Changed the proximity of runway and taxiway surfaces to public access roads;

f.  Added and modified runway and taxiway lighting;

g.  Construction, placement, and/or growth of adjacent structures, including landscaping, to runways which fall within the definition of obstacles to air navigation;

h.  Added passive traffic control signage for runways and taxiways; and

i.  Changed runway threshold displacements.

**SECOND CAUSE OF ACTION**
**Further Relief Pursuant To 28 U.S.C. § 2202**

112.  Plaintiffs incorporate the above as if fully set forth herein.

113.  Defendant, in refusing to comply with federal law and regulation and enforcement directive, has and continues to exhibit a refusal to voluntarily comply with these federal statutes, rules, and regulations.

114.  As such, Plaintiffs request the Court enter an Order compelling Defendant to file with the FAA by a time definite a Form 7480-1 for all construction, alterations, and modifications to the Parkland Airport which have occurred since 1978, including specific disclosure of all details concerning all of the following items which deviate from the approved form of Parkland Airport as described in the 1978 AMR:

a.  Changes to runway length and width for both Runway 08/26 and Taxiway E/Emergency Landing Strip 17/35;

b.  Changes to runway surface types;

c.  Building construction which restricts line of sight minimums where Runway 08/26 and Taxiway E/Emergency Landing Strip 17/35 intersect;

d.   Modified and added landing aids;

e.   Changed the proximity of runway and taxiway surfaces to public access roads;

f.   Added and modified runway and taxiway lighting;

g.   Construction, placement, and/or growth of adjacent structures, including landscaping, to runways which fall within the definition of obstacles to air navigation;

h.   Added passive traffic control signage for runways and taxiways; and

i.   Changed runway threshold displacements.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

Enter judgment according to the declaratory relief sought;

Enter an Order compelling Defendant's action according to the declaratory relief sought;

Award Plaintiffs their costs in this action; and

Enter such other further relief to which Plaintiffs may be entitled as a matter of law or equity, or which the Court determines to be just and proper.

Dated this 6th day of April, 2018.

s/ Robert J. Zavaglia, Jr.
Robert J. Zavaglia, Jr., Reg. No. 34974
Kathleen J. Johnson, Reg. No. 44524
TREECE ALFREY MUSAT P.C.
633 17th Street, Suite 2200
Denver, Colorado  80202
303.292.2700
303.295.0414 (facsimile)
zavaglia@tamlegal.com, kjohnson@tamlegal.com
*Attorneys for Plaintiffs*

Plaintiffs' address:
4719 Beverly Lane
Erie, CO 80516